**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

| | |
|---|---|
| JOHNNIE CRITES, <br><br>                     **Plaintiff,** <br><br> **v.** <br><br> AETNA LIFE INSURANCE COMPANY, <br><br>                **Defendant.** | **Case No. 4:19-cv-00098** <br><br> **JUDGE KRISTINE G. BAKER** |

**DEFENDANT AETNA LIFE INSURANCE COMPANY'S**
**BRIEF IN SUPPORT OF JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to the Court's April 8, 2019 ERISA Scheduling Order (ECF No. 8), Defendant Aetna Life Insurance Company ("Aetna" or "Defendant") hereby submits this brief in support of its motion for judgment on the stipulated Administrative Record as filed with this Court on June 11, 2019. (ECF No. 12). As demonstrated below, and based upon the medical and vocational evidence in the Administrative Record, Plaintiff cannot establish that she is totally disabled from performing any "reasonable occupation" as that term is defined in the Policy. Accordingly, Aetna's benefit determination was legally correct, reasonable, and certainly not arbitrary and capricious.

## STATEMENT OF UNDISPUTED FACTS

**I.    Relevant Terms and Conditions of the Group Long-Term Disability Policy.**

Aetna issued Group Policy No. GP-847033-GI (the "Policy") to Correct Care Solutions, LLC ("Correct Care") to insure the long-term disability ("LTD") component of Correct Care's employee welfare benefit plan (the "Plan"). *See* (AR 49, 73, 78, 104);[1] *See also* (Declaration of

---

[1] Citations to "(AR _____ )" are to the applicable Plan documents and the Administrative Record ("AR"), previously filed with the Court under seal on June 11, 2019. (Doc. 12). Aetna bates-stamped the AR "Aetna/Crites 0001-1573." In this Brief, for the sake of brevity, references to specific pages omit the leading zeros and abbreviate the "Aetna/Crites" Administrative Record as "AR." The Plan documents, including the LTD policy, are herein labeled "AR 1" though "AR 140" and the Administrative Record is herein labeled "AR 141" through "AR 1573."

Ashley Carey ("Carey Decl.") attached hereto as Exhibit "A" at ¶ 3). As an employee of Correct

Care, Plaintiff was a participant in the Plan, with LTD coverage effective on January 1, 2015.

(Doc. 5 at 2);[2] (Carey Decl. at ¶ 4); (AR 49, 78, 634, 1557). Plaintiff must meet the following "Test

of Disability" to be eligible for benefits:

> **Test of Disability**
> From the date that you first became disabled and until monthly benefits are payable
> for 24 months you meet the test of disability on any day that:
>
> - You cannot perform the **material duties** of your **own occupation** solely
>   because of an **illness**, **injury** or disabling pregnancy-related condition; and
> - Your earnings are 80% or less of your **adjusted predisability earnings**.
>
> **After the first 24 months of your disability** that monthly benefits are payable,
> you meet the plan's test of disability on any day you are unable to work at any
> **reasonable occupation** solely because of an **illness**, **injury** or disabling
> pregnancy-related condition.

(AR 84) (emphasis in original).

The Plan includes the following definition of "Reasonable Occupation":

> This is any gainful activity:
> - For which you are, or may reasonably become, fitted by education, training, or
>   experience; and
> - Which results in, or can be expected to result in, an income of more than 80%
>   of your **adjusted predisability earnings**.

(AR 101) (emphasis in original).

The Plan also has the following pre-existing condition language:

> **Pre-existing Conditions**
> A pre-existing condition is an **illness**, **injury** or pregnancy-related condition for
> which, during the 3 months before your coverage or increase in coverage became
> effective:
>
> - You were diagnosed or treated; or
> - You received diagnostic or treatment services; or
> - You took drugs that were prescribed or recommended by a **physician**.

---

[2] Citations to "(Doc. __ at __ )" or "(Doc. __ at ¶ __ )" are to the corresponding document in the Court's docket,
followed by the relevant page or paragraph number.

The plan does not pay benefits for a disability that is caused, or contributed to, by a pre-existing condition, if the disability starts within the first 12 months after your coverage goes into effect.

(AR 86) (emphasis in original).

## II.     Claim History.

### A.     Aetna Determined that Plaintiff's History of Migraines and Stroke Were "Pre-existing Conditions" Under the Terms of the Policy and Plan.

Plaintiff was formerly employed with Correct Care as a Licensed Practical Nurse (LPN) (medium physical demand level occupation), *see* (AR 248, 563, 666), until ceasing work on or about April 5, 2015 (AR 156, 620, 1002) due to hemiplegic migraine and stroke-like symptoms of left-sided muscle weakness. After ceasing work, Plaintiff sought treatment from Dr. Donald Brady (Neurology) for initial consultation on October 12, 2015, and complained of left-sided headache, tingling, and numbness. (AR 1468-70). During this visit, Dr. Brady detailed Plaintiff's prior medical history, noting that she was initially diagnosed with hemiplegic migraine and strokes in March 2014, after extensive testing failed to reveal any abnormalities, and was prescribed Plavix and Topamax for treatment. (*Id.*). Since 2014, Dr. Brady noted that Plaintiff continued to take Plavix and Topamax. (AR 1560 – 61). Given the "normality of prior extensive testing," Dr. Brady ultimately agreed with a prior diagnosis of classic migraines, but noted there was no clear precipitant other than Plaintiff's self-reported work stress. (AR 1560).

Because the effective date of Plaintiff's LTD coverage was January 1, 2015, and since she became disabled within 12-months of her effective date of LTD coverage, a pre-existing investigation was conducted for the period October 1, 2014 through December 31, 2014 to determine whether Plaintiff's disabling condition had been in existence during this three month time frame before her insurance became effective. (AR 634-37). In conducting its pre-existing

condition investigation, Aetna completed a clinical review and determined that both the medical documentation from Dr. Brady and the pharmacy records confirmed that Plaintiff was diagnosed with hemiplegic migraines and treated with Plavix to prevent blood clots/stroke and Topamax to control migraines during the pre-existing time period. (AR 175, 635, and 1488). On October 27, 2015, Aetna denied Plaintiff's claim due to pre-existing conditions of hemiplegic migraines and stroke, and noted insufficient evidence to support Plaintiff's alleged disabling condition of left-sided muscle weakness. (AR 635).

After this determination was rendered, Plaintiff submitted additional information, including office visit notes from Dr. Brady from November 9, 2015. (AR 1478-1480). Dr. Brady's updated treatment notes continued to document symptoms consistent with migraine, and expressed his confusion regarding the reason for Plaintiff's follow up, given that, just weeks before, Plaintiff had received a prescription for prophylactic medication to address her symptoms. (AR 1429). While Plaintiff complained of left-lower extremity numbness which caused her to fall, Dr. Brady's examination findings noted that Plaintiff had full physical strength in all extremities, and normal gait and station. (AR 1479). Plaintiff was ultimately instructed to continue taking her previously prescribed Topamax.  Dr. Brady further recorded in his notes that Plaintiff's visit was motivated by "possible secondary gain." (*Id*.).

By letter dated December 17, 2015, Aetna notified Plaintiff that the additional information she supplied was insufficient to warrant a reversal of its prior determination. (AR at 646 – 48). Aetna explained that, based on its review of the additional information, Plaintiff's left-sided weakness was related to her pre-existing hemiplegic migraine diagnosis, and therefore was similarly excluded from coverage under the Policy. (AR 647). Despite this determination, Aetna advised that it had recently requested additional treatment notes and/or objective testing from Dr. Brady,

and expressed its willingness to continue evaluating any additional information to determine whether such information warranted a reversal of its claim decision. (*Id.*).

Thereafter, Aetna received updated medical records from Dr. Brady, including a November 23, 2015 MRI of Plaintiff's lumbar spine. (AR at 1426). The MRI showed: (1) multilevel degenerative disc changes greatest from L3-L4 to LS-S1; (2) bulging disc and disc protrusion resulting in neural foraminal narrowing at L3-L4 through L5-S1 on the left, greatest at L5-S1; and (3) increased signal in the posterior annulus of L4-LS and L5-51, as can be associated with posterior annular tears. (AR 1431-32). By letter dated December 30, 2015, Aetna advised that these additional records failed to support a basis for reversing its prior determination that Plaintiff's left-sided weakness was related to Plaintiff's pre-existing condition of classic migraine and hemiplegic migraine. (AR at 649 – 50).

After this determination, Aetna continued to review Plaintiff's claim, and received written correspondence from Dr. Brady, dated January 18, 2016. (AR 1418). In addition to reiterating Plaintiff's migraine diagnosis, Dr. Brady's letter, for the first time, directly addressed the possible cause of Plaintiff's left-sided weakness, and noted that these symptoms did not appear to be related to Plaintiff's headaches. (*Id.*). Instead, Dr. Brady indicated that these symptoms were suggestive of possible psuedoclaudification, and were under continued investigation. (*Id.*). Upon receiving Dr. Brady's correspondence, Aetna conducted a clinical assessment which confirmed that Plaintiff's left-sided numbness and weakness were secondary to pseudoclaudification, which would relate to lumbar disc disease, rather than Plaintiff's hemiplegic migraines. (AR 237, 239, 563). As a result of this clinical assessment, Aetna approved Plaintiff's claim for LTD benefits under the "own occupation" definition of "Disability" by letter dated January 29, 2016, and advised that benefits were retroactively effective as of October 2, 2015. (AR 651-52, 659).

**B.    Aetna Continues to Review Plaintiff's Claim for LTD Benefits Based on the Plan's "Own Occupation" Test of Disability.**

Following its approval of Plaintiff's claim under the "own occupation" standard, Aetna continued to receive and review updated medical records which supported full-time sedentary-level functionality. (AR 560, 563, 1475). Notably, an Attending Physician Statement ("APS"), completed by Dr. Brady on December 1, 2015, confirmed that Plaintiff was able to work up to 8 hours a day, 5 days a week, with sedentary restrictions. (AR 1475). Considering this functionality, Aetna referred Plaintiff's claim to a vocational rehabilitation consultant in April 2016 for assistance with potential future job placement. (AR at 1396 – 98). In connection with this referral, a Transferable Skills Analysis was conducted in March 2016 which identified **26** occupations varying from "closest" to "good" matches existing in Plaintiff's labor market as goals for job placement. (AR at 560).

As part of the vocational referral, a job search was also conducted, which confirmed the availability of two sedentary occupations within Plaintiff's local labor market. (AR 1397). Notably, wage information was obtained for one of the two sedentary occupations/job openings, and revealed a salary comparable to Plaintiff's previous salary (offering up to $37,954 per year). *See* (AR 1397). Although these two sedentary-level job openings were circulated to Plaintiff, along with application instructions, Plaintiff refused to follow up on the job leads or participate in the vocational rehabilitations services being offered by Aetna. (AR 559 and 1397).

Nevertheless, Aetna continued to review Plaintiff's claim and received medical records from Dr. Donald Blagdon (Family Medicine), including records from an initial office visit on June 1, 2016. (AR at 1355 – 60). During this initial evaluation, Dr. Blagdon assessed Plaintiff for possible "prior complicated migraines or probably more likely meth/cocaine abuse," although Plaintiff's high BMI made the potential for meth/cocaine abuse less likely. (AR at 1356). Plaintiff's multi-

level degenerative disc disease ("DDD") was also documented, and a neurosurgery referral was recommended. (*Id*.). Despite reports of back and neck pain, an examination revealed normal range of motion throughout Plaintiff's musculoskeletal system, normal neurological findings, and no tenderness. (AR 1356 – 57). As part of her evaluation, Plaintiff underwent a urine drug screening test ("UDS"), which Dr. Blagdon noted was "not surprisingly" positive for "obvious THC addiction." (*Id*.). Considering this finding, Dr. Blagdon indicated that he would refrain from prescribing narcotics. (*Id*.). Aetna also received a capabilities and limitations worksheet completed by Dr. Blagdon on July 14, 2016. (AR at 1384). The worksheet confirmed that Plaintiff could occasionally sit, stand and walk, and could constantly lift up to 25 lbs., frequently lift up to 35 lbs., and occasionally lift up to 50 lbs. (*Id*.). On the worksheet, Dr. Blagdon noted that Plaintiff was awaiting a neurosurgical referral, but was capable of working up to 8 hours per day. (*Id*.).

Subsequent medical records from Dr. Blagdon, dated October 31, 2016, supported these same restrictions and limitations, and noted that Plaintiff's lumbar and cervical DDD were minor, with no evidence of herniated nucleus pulpous or any neurological deficits. (AR 1320). Despite Plaintiff's continued complaints of back and neck pain, with numbness and weakness, Dr. Blagdon noted that Plaintiff's musculoskeletal and central nervous examination findings were "**all completely normal**," and revealed normal range of motion, reflexes, and no evidence of tenderness or edema. (AR 1321) (emphasis in original). He further noted, upon a recent neurosurgical referral, "only symptomatic" epidural steroid injections were offered, since Plaintiff was "obviously" not a surgical target. (*Id*.). In addition, Dr. Blagdon documented Plaintiff's history of psycho-somatic complaints, life-long polysubstance use, THC addiction, and life-long narcotics use. (AR 1320). Dr. Blagdon reiterated that he would not prescribe narcotics to Plaintiff,

and expressed his opinion that Plaintiff was likely "just looking for stimulants," and would need a UDS and assignment to a prescription monitoring program at the next visit. (*Id.*).

During a follow up appointment on January 20, 2017 for a medication refill, Dr. Blagdon noted that Plaintiff continued to be followed by a neurosurgeon, but was not scheduled for surgery. (AR 1308). Plaintiff's blood pressure was "very hypertensive" as 180/102, and Dr. Blagdon remarked that Plaintiff "obviously" needed a UDS, and somehow escaped her last visit without undergoing such screening. (*Id.*). He further noted that, during a recent hospitalization, Plaintiff reported seizure-like activity that was "clearly psychogenic," and due to conversion disorder. (*Id.*). Plaintiff continued to report neck and back pain with numbness, but denied gait abnormality, joint swelling, neck stiffness, or arthralgia. (*Id.*). Similar to past visits, Plaintiff's musculoskeletal and neurological examinations revealed normal findings, including full range of motion throughout her neck and body. (AR 1309). Despite his prior statements that Plaintiff would not be prescribed narcotics, Dr. Blagdon prescribed hydrocodone to address Plaintiff's self-reported pain complaints. (*Id.*). Thereafter, Plaintiff returned to Dr. Blagdon for follow up appointments on February 21 and April 20, 2017. (AR 1282 – 83, 1294 - 95). Once again, examination findings were completely normal. (*Id.*).

### C. Aetna's Evaluation and Termination of Plaintiff's Claim Under the Any "Reasonable Occupation" Standard.

By letter dated August 17, 2017, Aetna advised that it was reviewing Plaintiff's file to determine if Plaintiff would continue to qualify for LTD benefits past October 2, 2017, when the test of disability would change to "any reasonable occupation." (AR 720-22); *see also* (AR 529). In an effort to obtain updated medical records, Aetna contacted Dr. Blagdon's office on August 17, 2017 to confirm whether Plaintiff had been seen since her follow up appointment on April 20, 2017. (AR 546). Based on a conversation with Dr. Blagdon's office staff, Aetna learned that

Plaintiff had not sought treatment since April 20, 2017, and "had no future office visits scheduled." (*Id.*). On September 19, 2017, Aetna attempted (three separate times) to initiate contact with Dr. Blagdon's office to request updated office visit notes. (AR 543). When these efforts proved unsuccessful, Aetna proceeded with referral of Plaintiff's claim for an internal clinical assessment. (*Id.*).

On September 19, 2017, an internal clinical assessment was conducted by Julie Ballas, who concluded that the medical records continued to support Dr. Blagdon's most recent restrictions and limitations from July 2016. (AR 357 – 59). Agreeing with Dr. Blagdon's restrictions, Ms. Ballas confirmed that Plaintiff could drive and use machinery; constantly lift up to 20 lbs. at a time, frequently lift 35 lbs., and occasionally lift 50 lbs.; occasionally use left and right upper extremities; occasionally sit, stand, walk; and work up to 8 hours per day. (AR 358).

Before proceeding with further investigative efforts and an eventual vocational analysis, Aetna attempted, once more, to contact Dr. Blagdon's office for updated medical records and treatment notes. (AR 542). Similar to past attempts, it was unsuccessful. (*Id.*). Aetna also contacted Dr. Brady's office for an update on Plaintiff's neurological care, and learned that Plaintiff had not sought treatment since November 9, 2015, and failed to show up for a follow up visit in February 2016. (AR 540).

On September 28, 2017, Aetna referred Plaintiff's claim to vocational case manager Joseph L. Thompson, who performed a Transferable Skills and Labor Market Analysis to evaluate the availability of alternative occupations meeting Plaintiff's capabilities and the Policy's earnings requirement. (AR at 1264 – 70). Taking into account Plaintiff's educational background and job history, as well as Dr. Blagdon's most recent sedentary-level restrictions and limitations, Aetna identified three alternative sedentary-level occupations for which Plaintiff possessed the

transferable skills to perform: (1) Call-Out Operator, (2) Reservation Clerk, and (3) Personal Scheduler - each <u>exceeding</u> the Policy's required earnings potential. (AR at 1266-67). In addition, and although not required under the Policy, Aetna determined that each position was available in Plaintiff's own labor market within 100-miles of Hot Springs Village, Arkansas. (AR 1267 – 69).

By letter dated October 2, 2017, Aetna terminated Plaintiff's claim for LTD benefits under the any "reasonable occupation" standard of "Disability," based on its determination that Plaintiff was fully capable of performing full-time sedentary work. (AR 755-58). In particular, Aetna's letter highlighted the most recent sedentary level restrictions and limitations from Dr. Blagdon, the clinical assessment which concluded that updated medical records continued to support Dr. Blagdon's restrictions, and the three alternative sedentary occupations identified from the vocational assessment. (AR 756). Aetna also documented its multiple, unsuccessful attempts to obtain updated medical records in connection with its any "reasonable occupation" review. (*Id.*).

**D.      Aetna Reviews Additional Evidence Received After its Any "Reasonable Occupation" Decision, and Determines that the Evidence is Insufficient to Warrant Reversal and Reinstatement.**

After discontinuing Plaintiff's claim under the any "reasonable occupation" standard, Aetna received updated office visit notes, detailing a follow up visit with Dr. Blagdon on September 27, 2017, and an APS and completed capabilities and limitations worksheet, dated September 29, 2017. (AR 1232 – 54). Dr. Blagdon's September 27, 2017 office visit notes reflected a diagnosis of severe cervical DDD, despite normal range of motion in Plaintiff's neck, and normal musculoskeletal and neurological examination findings. (AR 1232 – 33). During this visit, a cervical and lumbar MRI were ordered to monitor Plaintiff's DDD, and a prescription for hydrocodone was written for Plaintiff's complaints of chronic pain. (AR 1234 – 35). In an updated APS, dated September 29, 2017, Dr. Blagdon listed diagnoses of cervical and lumbar DDD, with

symptoms of chronic neck and back pain, and prior cerebrovascular accident ("CVA"). AR (1253). Regarding Plaintiff's functionality, Dr. Blagdon noted she could do "mostly anything now. No radiculopathy, no surgery planned." (*Id*.). Dr. Blagdon also completed a capabilities and limitations worksheet, dated September 29, 2017, opining that Plaintiff could continuously sit; frequently stand and walk; frequently reach at all levels; and lift up to 10 lbs. constantly, up to 35 lbs. frequently, and up to 50 lbs. occasionally. (AR 1248). Despite these limited restrictions, and consistently normal examination findings, Dr. Blagdon recorded that Plaintiff was only capable of working up to 4 hours per day. (*Id*.).

Given that Dr. Blagdon's updated information was received shortly after its termination decision, Aetna conducted a reinstatement triage, to determine whether the new information provided grounds for reversing its "reasonable occupation" determination. (AR 391 – 92). Through this process, Aetna confirmed that the medical records continued to support full-time sedentary capacity. (AR 392). Notably, while Plaintiff continued to take pain medication, such medication was typically not impairing when it was taken regularly at an established dosage. (*Id*.). By letter dated November 9, 2017, Aetna notified Plaintiff that the recent information was not sufficient to warrant a reversal of its disability claim decision. (AR 785).

On November 13, 2017, Aetna received an updated capabilities and limitations worksheet completed by Dr. Blagdon on October 30, 2017, which noted that Plaintiff could sit continuously; stand and walk occasionally; lift up to 10 lbs. frequently, and up to 35 lbs. occasionally; and engage in continuous repetitive motion. (AR 1221). Dr. Blagdon noted that Plaintiff could perform hand grasping, gross manipulation, and fine manipulation on a continuous basis, along with firm hand grasping on a frequent basis. (*Id*.). Notwithstanding these sedentary-level restrictions (virtually identical to his findings a month prior), Dr. Blagdon recorded that Plaintiff was limited to 2 hours

of work per day. (*Id.*). Updated medical records, dated November 9, 2017, continued to confirm completely normal physical, and neurological examination findings, with normal range of motion in Plaintiff's neck, and throughout the other areas of Plaintiff's body, and updated MRI imaging reflected the same multi-level degenerative changes in Plaintiff's cervical and lumbar spine. (AR 1200 – 08). Upon reviewing these updated records, Aetna again advised Plaintiff that the evidence was insufficient to warrant a reversal of its benefit determination. (AR 786).

On November 16, 2017, Aetna placed a telephone call to Dr. Blagdon, requesting clarification regarding Plaintiff's ability to perform sedentary work on a full-time basis, given Dr. Blagdon's statements that Plaintiff was capable of sedentary function, yet for less than 8 hours per day. (AR 410, 534). During the call, Dr. Blagdon confirmed that Plaintiff was relatively active, and fully capable of engaging in full-time sedentary work. (AR 410 – 11). After this telephone call, Aetna received a third capabilities and limitations worksheet from Dr. Blagdon, dated November 20, 2017. (AR 1195). Similar to past worksheets, Dr. Blagdon continued to note restrictions in keeping with sedentary-level functionality (continuous sitting, occasional standing and walking, and frequent lifting up to 10 lbs.); however, instead of limiting Plaintiff to 2 – 4 hours of work per day, Dr. Blagdon's updated worksheet did not document <u>any</u> durational restrictions. (*Id.*). Consistent with Dr. Blagdon's most recent restrictions and findings, Aetna determined that the information was insufficient to warrant a reversal of its "reasonable occupation" claim determination, as the evidence failed to support an inability to engage in full-time sedentary work. (AR 787).

On November 27, 2017, Aetna received copies of October 31, 2017 office visit notes from neurosurgeon Dr. Scott Schlesinger, detailing an initial consultation. (AR 1187 - 93). During this consultation, Dr. Schlesinger diagnosed Plaintiff with cervicalgia; other cervical disc degeneration, unspecified cervical region; low back pain; and intervertebral disc degeneration,

lumbar region. (AR 1193). Dr. Schlesinger documented Plaintiff's complaints of pain, localized to her lower back, neck, and tailbone, and largely normal examination findings. (AR 1187 – 90). Notably, Dr. Schlesinger noted some decrease in Plaintiff's cervical range of motion, but noted that Plaintiff had full range of motion in her upper extremities without pain, and exhibited full motor strength. (AR 1190). Plaintiff's muscle tone, gait, and reflexes were all noted to be within normal limits. (AR 1191).

As a result of his examination findings, Dr. Schlesinger determined Plaintiff could be discharged from his care, as no surgery was recommended. (AR 1193). While no follow up appointment was scheduled, Dr. Schlesinger noted that, if any problems arose, he would be happy to see Plaintiff again, but would limit further treatment to conservative care. (*Id*.). After reviewing Dr. Schlesinger's consultation notes, Aetna again determined that the evidence was insufficient to support reinstatement of Plaintiff's benefits given to her ability to perform sedentary work. (AR 790).

### E.    On Appeal, Aetna Upholds its LTD Determination.

By letter dated March 30, 2018, Plaintiff, through counsel, formally appealed the termination of her benefits. (AR 1114-21). Plaintiff's appeal letter challenged Dr. Blagdon's opinions, arguing that they were based on inaccurate or incomplete information, and further argued that Plaintiff was disabled from any occupation "due to the combined disabling effects" of her cervical and lumbar DDD, and longstanding diagnoses of multiple strokes/transient ischemic attack, migraine, depression, anxiety, insomnia, and irritable bowel syndrome ("IBS"). (*Id*.). In connection with her appeal, Plaintiff submitted medical records, the majority of which pre-dated Aetna's any "reasonable occupation" determination. *See* (AR 994 – 112). For example, hospital records from a visit in 2014, and again in 2015, detailed self-reported episodes of left-sided weakness,

"suspicious for conversion disorder." (AR 997 – 1002). Subsequent hospital records from 2016 revealed that Plaintiff arrived in an ambulance, and reported intermittent spasms following an epidural steroid injection administered by her neurologist. (AR 1029 – 30, 1039). In addition to older medical records, Plaintiff also submitted records relating to a recent hospital admission on January 12, 2018 due to complaints of possible stroke/TIA. (AR 1097 – 02). During this hospitalization, a CT scan of Plaintiff's head was performed, which revealed left periventricular white matter changes consistent with remote lacunar infarct (chronic stroke), with no evidence of acute intracranial abnormality. (AR 1097).

On appeal, Plaintiff also submitted medical records detailing a February 22, 2018 office visit with her new treating physician, Dr. Derrick Lewis (Family Medicine), along with a completed capabilities and limitations worksheet. (AR 1105 – 08). The records revealed that Plaintiff sought initial treatment with Dr. Lewis "to establish a PCP" and discuss her medications. (AR 1106). During this initial visit, Plaintiff reported symptoms of back and joint pain, dizziness, loss of strength, headaches, and difficulty with balance. (AR 1107). However, upon examination, Plaintiff's spine was noted to be normal, and Plaintiff exhibited full range of motion in her neck and back. (*Id*.). Plaintiff's extremities also reflected full range of motion, and a neurological examination noted normal motor strength, and sensory function. (*Id*.). Following this initial visit, Dr. Lewis completed a capabilities and limitations worksheet, dated February 22, 2018, diagnosing Plaintiff with hemiplegic migraine and providing sedentary-level restrictions. (AR 1105). In particular, Dr. Lewis noted that Plaintiff could frequently sit, stand, walk, grasp, manipulate, and engage in repetitive motion; occasionally push, pull, and reach; and lift up to 10 lbs. on a frequent basis. (*Id*). Notwithstanding this level of functionality, Dr. Lewis noted that Plaintiff should remain off work pending a neurological evaluation for her hemiplegic migraines. (*Id*.).

In connection with its appeal review, Aetna referred Plaintiff's medical records to Reliable Review Services, a third-party vendor, for an independent neurological peer review opinion to further clarify Plaintiff's functionality. (AR at 962 – 75). On April 24, 2018, Reliable Review Services referred the file to Dr. Mostafa Farache, a physician board certified in neurology and clinical neuropsychology. (*Id*.). Following his review of all the medical records provided, Dr. Farache completed a report confirming that Plaintiff's cervical and lumbar spine spondylosis and degenerative changes were the only conditions supporting any level of functional impairment. (AR 974).[3] Despite these diagnoses, Dr. Farache provided restrictions and limitations, as of October 2, 2017, confirming Plaintiff's ability to perform at an above-sedentary level of functionality. (AR 974 – 75). As a result of his review, Dr. Farache concluded that Plaintiff could sit and engage in fine finger/hand movement without restriction, stand and walk for up to 4 hours per day, lift and carry up to 50 lbs. occasionally, push and pull up to 75 lbs. occasionally, and reach at all levels on a frequent basis. (*Id*.).

In addition to these restrictions, Dr. Farache evaluated Plaintiff's self-reported complaints and normal examination findings. (AR 973). Dr. Farache noted that, while the objective findings supported "a lot of functionality," they called into question the validity of Plaintiff's self-reported symptoms, and suggested these reports were "manipulative behaviors." (*Id*.). For instance, Dr. Farache noted that, on one occasion, Plaintiff was prescribed narcotics for pain and tested negative on UDS while she was actually positive for THC. (*Id*.). He further noted Plaintiff's complaints of collapsing gait, which in most cases was psychosomatic. (*Id*.). During one hospital visit, Plaintiff was seen using her left side normally, and leaving the ER on foot, moments after complaining of

---

[3] While Dr. Farache made every effort to contact Plaintiff's treating physicians to discuss Plaintiff's functionality, these efforts were unsuccessful. (AR 972 – 73).

left-sided weakness. (*Id.*). Considering these observations and the normal examination findings, Dr. Farache noted it was hard to know which of Plaintiff's complaints were real versus fictitious. (*Id.*).

Given that Dr. Farache was unable to initiate contact with Plaintiff's treating providers as part of his review, Aetna sent Dr. Farache's review to Drs. Lewis and Schlesinger for review and input; however, neither responded. (AR 481, 484, 821, 836). Aetna continued its appeal review, and evaluated the 2017 Transferable Skills and Labor Market Analysis' findings in light of Dr. Farache's opinion. (AR 489). Aetna confirmed that the three alternative sedentary occupations from this prior vocational analysis continued to serve as appropriate alternative "reasonable occupations" in light of Dr. Farache's opinion of Plaintiff's above-sedentary level functionality. (*Id.*).

On June 7, 2018, Aetna upheld its "reasonable occupation" denial on appeal, based on its determination that Plaintiff was not precluded from full-time sedentary work. (AR 854 – 57). Aetna noted that Plaintiff's degenerative conditions were the only diagnoses supporting any functional impairment, and that some of Plaintiff's other diagnoses were "pre-existing" conditions, barred from coverage under the Policy. (AR 856). While some restrictions were noted, based on Dr. Farache's independent review, Aetna determined that Plaintiff did not suffer impairments that would preclude her from performing full-time sedentary-level occupations (and even had above-sedentary-level functionality, despite her degenerative cervical and lumbar issues). (AR 854 - 57).

**F.      Aetna Reviews Additional Information Received from Plaintiff.**

While Aetna's appeal determination confirmed that its decision was final, Plaintiff continued to submit information to Aetna in the months after the exhaustion of her claim. (AR 856 – 57, 891). The additional information included a capabilities and limitations worksheet, completed by Dr. Lewis on July 12, 2018, and treatment notes from the same date. (AR 899). Deviating from his prior restrictions, Dr. Lewis noted that Plaintiff could sit, stand, walk, lift up to 10 lbs., and engage in grasping and manipulation on an occasional basis, and further noted that repetitive movement was restricted. (*Id*.). Dr. Lewis wrote "N/A" next to total hours Plaintiff could work per day and noted that her restrictions were permanent. (*Id*.). Nevertheless, Dr. Lewis' recent examination findings confirmed full range of motion in Plaintiff's neck, back, and extremities, despite difficulty when reaching above shoulder level. (AR 897 - 98). Moreover, a neurological examination reflected full motor strength in Plaintiff's upper and lower extremities, and intact sensory function. (*Id*.). Following these examinations, Dr. Lewis noted that Plaintiff's prognosis was "pain," and that there were no identifiable factors impacting Plaintiff's functional capacity. (AR 898).

Aetna sent Dr. Lewis' records to Dr. Farache with an addendum request. (AR 511). On July 23, 2018, Dr. Farache completed his addendum, noting that the new medical records did not change his opinion, and documented a normal neurological examination with intact motor and sensory function. (AR 890 – 91). By letter dated July 24, 2018, Aetna notified Plaintiff that the additional information submitted after Plaintiff's appeal determination was insufficient to warrant reversal. (*Id*.).

## STANDARD OF REVIEW

**I.      Judicial Review of Aetna's Determination is Governed by the Arbitrary and Capricious Standard.**

As acknowledged in the Court's ERISA Scheduling Order, the abuse of discretion standard applies if the applicable plan documents give the administrator or claims fiduciary discretionary authority to determine eligibility for benefits or construe plan terms. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also* (ECF No. 8).  Here, it is undisputed that the Policy vests Aetna, as claims administrator, with full discretionary authority to construe and interpret the terms of the Policy and to determine eligibility for benefits thereunder. (AR 70). As a result, this Court should apply the abuse of discretion standard in reviewing Aetna's benefit determination. Under this standard, the claim administrator's decision should be reversed "only if it is arbitrary and capricious." *Midgett v. Washington Group Intern. Long Term Disability Plan*, 561 F.3d 887, 896 (8th Cir.2009). Conversely, the claim administrator's decision should be upheld if the administrator provides a "reasonable explanation for its decision, supported by substantial evidence." *Ratliff v. Jefferson Pilot Fin. Ins. Co.,* 489 F.3d 343, 348 (8th Cir. 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *River v. Edward D. Jones Co.,* 646 F.3d 1029, 1033 (8th Cir. 2011). If substantial evidence is found, the claim administrator's decision should be upheld even if a different, reasonable interpretation exists. *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997). "The requirement that the [claim administrator's] decision be reasonable should be read to mean that a decision is reasonable if a reasonable person *could* have reached a similar decision,

given the evidence before him, not that a reasonable person *would* have reached that decision." *Midgett,* 561 F.3d at 897 (emphasis in original).[4]

## ARGUMENT

**I. Aetna's Determination That Plaintiff Could Perform Alternative Sedentary Occupations Was Legally Correct.**

Aetna readily acknowledges that Plaintiff suffers from DDD in her cervical and lumbar spine, and that her complaints of pain and weakness in relation to these conditions are documented in the Administrative Record. Aetna further acknowledges that Plaintiff's treating physicians continued to support Plaintiff's inability to perform her medium-level occupation throughout the "own occupation" period of "Disability" due to these conditions. Notwithstanding these acknowledgments, as an ERISA claims administrator, Aetna is bound by the terms of the Policy, which require that Plaintiff demonstrate an inability to perform any "reasonable occupation" in order to be eligible for continued LTD benefits after October 2, 2017.

In addition to the Policy's requirements, binding ERISA jurisprudence places the burden on Plaintiff to demonstrate that she is disabled from any "reasonable occupation" as of October 2, 2017. *See* (AR at 85 and 96); *Farley v. Benefit Trust Life Ins. Co*., 979 F.2d 653, 658 (8th Cir. 1992) (holding that an ERISA plaintiff bears the burden of proving entitlement to benefits). As detailed below, Plaintiff cannot (and did not) meet her burden of demonstrating she was disabled under this stricter definition of Disability. To be certain, the medical and vocational evidence in the Administrative Record supports the opposite conclusion, confirming Plaintiff's ability to

---

[4] While Aetna acknowledges that Arkansas Administrative Code 054.00.101-4 prohibits the inclusion of discretionary clauses in "all disability income policies issued in [Arkansas] which are issued or renewed on and after March 1, 2013," this insurance regulation is inapplicable to the Policy at issue which was issued in Tennessee, and is subject to the laws of that state. (AR at 50). Notably, Tennessee does not prohibit discretionary clauses. Consequently, the applicable standard of review is arbitrary and capricious, and the Court need not determine whether ERISA preempts the inapplicable Arkansas regulatory provision banning discretion.

perform alternative sedentary occupations. Accordingly, Aetna's decision to terminate continued LTD benefits was correct, and should be upheld by this Court.

### A. The Medical Evidence, and Plaintiff's Treating Physicians, Support Plaintiff's Ability to Perform Sedentary-Level Work.

While Plaintiff insists that her degenerative spinal conditions render her completely unable to perform in another occupation, the medical records and examination findings—both before and after the "reasonable occupation" test change—paint a completely different picture. In fact, just months after ceasing work in 2015, Plaintiff's then-treating neurologist, Dr. Brady, confirmed that Plaintiff was fully capable of working full time at a sedentary activity level. (AR 561, 563, 1475). Dr. Brady's opinion is supported by the medical records from this time frame, documenting a host of normal testing and examination results, as well as demonstration of full physical strength and range of motion upon exam. (AR 1479, 1560). Subsequent medical records throughout 2016 document similar findings, and consistently normal examinations, detailing continued full range of motion, and no neurological deficits. (AR 1321, 1356 – 57). Consistent with these records, Plaintiff's then-primary care physician, Dr. Blagdon, completed a capabilities and limitations worksheet in July 2016, confirming Plaintiff was physically capable of full-time sedentary activity. (AR 1384).

Medical evidence from 2017, obtained prior to the "reasonable occupation" effective date, reveals similar normal findings, noting no appreciable decline in Plaintiff's physical ability. (AR 1309, 1282 – 82, 1294 – 95). Indeed, physical examinations continued to document normal range of motion throughout Plaintiff's body, including her neck and lumbar spine. (*Id.*). Neurological examinations also remained consistently normal, noting no deficits impacting Plaintiff's functionality. (*Id.*). Based on this evidence, which indicated that Plaintiff's condition and sedentary work function remained essentially unchanged since 2015, Aetna identified 3 alternative sedentary

occupations that Plaintiff was capable of performing, and properly denied benefits on the "any occupation" effective date.

While Plaintiff will argue that Dr. Blagdon supported her inability to perform sedentary occupations based on his durational limitations, limiting Plaintiff to 4 hours of work per day in September 2017, and increasing this limitation to 2 hours per day by late-October 2017 (AR 1221, 1248), these durational limitations lack any reasonable or even meaningful support, considering Plaintiff's demonstrated functionality upon examination. (AR 1200 – 08, 1232 – 33). Regardless, Dr. Blagdon later <u>corrected</u> these durational limitations in a telephone conference with Aetna in November 2017, during which he acknowledged that Plaintiff was active and fully capable of full-time work at a sedentary-level. (AR 410, 534). Based on Dr. Blagdon's November 2017 clarification, and in light of the normal objective physical and neurological examination findings from 2015 throughout 2017, Aetna's "reasonable determination" was also entirely correct.

In challenging Aetna's determination, Plaintiff submitted a host of medical records pre-dating 2017, which fail to change the analyis in Plaintiff's favor. Indeed, the only new medical evidence submitted on appeal, and post-dating the "reasonable occupation" test change date, fails to support Plaintiff's claimed disability. While Plaintiff underwent a neurosurgical evaluation in late-2017, the neurosurgeon, Dr. Schlesinger, confirmed full strength in Plaintiff's extremities, and no signs of atrophy. (AR 1190). Although some restriction in cervical range of motion was observed, muscle tone, reflexes, and gait were notably normal, and no sensory deficits were found. (AR 1191). Consistent with these findings, Dr. Schlesinger found that Plaintiff's condition was not severe enough to require surgery, and discharged Plaintiff from his care. (*Id*.). Thereafter, the medical evidence revealed that that Dr. Blagdon discontinued care, causing Plaintiff to seek out another physician (Dr. Lewis) in 2018. (AR 458).

Similar to Dr. Blagdon's examination results, Dr. Lewis' examination findings revealed completely normal results. (AR 1107). Given these findings, Dr. Lewis provided light-level restrictions and limitations in February 2018, confirming that Plaintiff could sit, stand, walk, and lift up to 20 lbs. on a frequent basis, and lift up to 35 lbs. occasionally. (AR 1105). While Dr. Lewis indicated that Plaintiff should remain off work, pending a neurosurgical evaluation, this opinion is contravened by the very restrictions he provides. (*Id.*). Nevertheless, Dr. Lewis' opinion (based on one office visit) lacks the benefit of Plaintiff's full medical history, including her late-2017 neurosurgical evaluation, the results of which confirmed Plaintiff was not a surgical candidate. (AR 1193). In this regard, his opinion that Plaintiff should remain off work, despite his above-sedentary restrictions, is conclusory and wholly lacking in support.[5]

The above volume of medical evidence provides clear support for Aetna's determination, and establishes that Aetna's any "reasonable occupation" decision was, and is, correct. In fact, based on the evidence, this conclusion was supported as far back as 2015, just months after Plaintiff ceased work. *See, e.g.* (AR 1475). While Plaintiff suffers from cervical and lumbar DDD, these conditions do not prevent range of motion, or otherwise impact Plaintiff's ability to engage in another occupation. Although Plaintiff is expected to argue that her pain is a disabling factor, the validity of this argument is highly questionable in light of the consistently normal physical and neurological examination findings, statements from Plaintiff's treating physicians supporting sedentary functionality, the conclusion from Plaintiff's former neurosurgeon confirming that surgery was not recommended, and indications of secondary gain and potential drug abuse documented throughout the medical records.

---

[5] While Dr. Lewis' updated restrictions from July 2018, after Aetna's appeal determination, advocate for Plaintiff's disability, these restrictions are directly contrary to Dr. Lewis' own office visit notes, noting normal examination findings, and no factors impairing Plaintiff's functionality. (AR 897 – 99).

**B.** **The Vocational Evidence Confirms Plaintiff's Ability to Return to the Workforce.**

Not only did Aetna determine that Plaintiff was medically able to function at a sedentary-level, it also identified specific sample occupations which met Plaintiff's functional capabilities as part of its ongoing claims review. (AR 560, 1397, 1246 - 70). First, more than a year before the any "reasonable occupation" test change and Aetna's benefit determination, Aetna obtained a Transferable Skill Analysis in March 2016 which identified **26** occupations varying from "closest" to "good" matches and existing in Plaintiff's labor market as goals for job placement. (AR 560). Thereafter, Aetna provided vocational rehabilitation services to Plaintiff, including a job search which confirmed the availability of two sedentary occupations in Benton, Arkansas. (AR 1397). Notably, wage information was obtained for one of the two sedentary occupations/job openings, and revealed a salary comparable to Plaintiff's previous salary (offering up to $37,954 per year). *See* (AR 1397). While Aetna circulated these two sedentary-level job openings to Plaintiff and provided application instructions, Plaintiff refused to follow up on these job leads, or participate in the vocational rehabilitations services being offered by Aetna. (AR 559, 1397)

Despite Plaintiff's unwillingness to participate in Aetna's vocational rehabilitation services, Aetna continued to award LTD benefits throughout 2016 and into 2017. On September 28, 2017, in connection with its "any occupation" investigation, Aetna performed a Transferable Skills and Labor Market Analysis to evaluate the availability of alternative occupations meeting Plaintiff's capabilities and the Policy's earnings requirement. (AR at 1264 – 70). Taking into account Plaintiff's educational background and job history, as well as Dr. Blagdon's most recent sedentary-level restrictions and limitations, Aetna identified three alternative sedentary-level occupations that Plaintiff possessed the transferable skills to perform. (AR 1266 – 67). The identified occupations of (1) Call-Out Operator, (2) Reservation Clerk, and (3) Personal Scheduler all

<u>exceeded</u> the Policy's required earnings potential. (AR at 1267). In addition, and although not required under the Policy, Aetna determined that each position was available in Plaintiff's own labor market within 100-miles of Hot Springs Village, Arkansas. (AR 1267 – 69).

The identification of these **<u>three</u>** alternative occupations, standing alone, demonstrates that Plaintiff is both physically capable and reasonably fitted to engage in any "reasonable occupation" as that term is defined in the Policy. To be sure, the Eighth Circuit has upheld ERISA benefits determinations under similar occupational definitions of disability with far less supportive vocational evidence. *See, e.g. Gerhardt v. Liberty Life Assurance Co. of Boston*, 736 F.3d 777, 781 – 82 (8th Cir. 2013) (holding that ERISA claims administrator's termination of benefits was reasonable based on a transferable skills analysis identifying "**at least one**" alternative occupation the plaintiff was capable and reasonably fitted to perform) (emphasis added); *Daigle v. Hartford Life and Accident Insurance Co*., 2011 WL 861176, at *7 (E.D. Ark. Mar. 11, 2011), *aff'd*, 452 F. App'x 689 (8th Cir. 2011) (holding that ERISA claims administrator's termination of benefits was supported by a full and fair review where the claims administrator prepared an employability analysis, taking into account the plaintiff's capabilities, education, training, and work history, and finding **one** alternative occupation present in the national economy, and exceeding the policy's earnings requirement) (emphasis added).

In summary, Plaintiff's physical capacity and vocational experience reveal that she would be a marketable candidate in the workplace. Indeed, the vocational analysis from 2016, and the Transferable Skills and Labor Market Analysis conducted in 2017, confirmed the existence of alternative sedentary-level occupations meeting Plaintiff's functional capabilities, exceeding the Policy's earning requirement, and existing in Plaintiff's own labor market, no less. Given this evidence, Plaintiff's ability to engage in employment in any "reasonable occupation" is fully

supported and confirmed by the evidence in the Administrative Record.

      **C.**      **The Independent Neurological Review Obtained by Aetna Further Supports Plaintiff's Ability to Engage, At a Minimum, in Sedentary-Level Work.**

Even though the medical and vocational evidence in the Administrative Record continued to support Plaintiff's sedentary-level functionality both before and after the "reasonable occupation" effective date, Aetna continued to diligently investigate Plaintiff's claim on appeal. As part of its appeal review, Aetna referred Plaintiff's medical records to Reliable Review Services, a third-party organization, for an independent neurological peer review to clarify Plaintiff's functionality based on updated medical records submitted on appeal. (AR at 962 – 75). On April 24, 2018, Reliable Review Services referred the file to Dr. Mostafa Farache, board certified in neurology and clinical neuropsychology, for an appeal review from a neurological perspective. (*Id*.).

Following his thorough review of all the medical records provided, Dr. Farache completed a report wherein he confirmed that Plaintiff's cervical and lumbar spine spondylosis and degenerative changes were the <u>only</u> conditions supporting any level of functional impairment. (AR 974).[6] Despite these diagnoses, Dr. Farache determined that Plaintiff was physically capable of functioning at an <u>above</u>-sedentary level based on the totality of the medical evidence. (AR at 856 and 974 – 75). In particular, Dr. Farache's report emphasized the marked discrepancy between Plaintiff's self-reported complaints, and the objectively normal examination findings. (AR 973). While, on the one hand, these objective findings supported "a lot of functionality," they also suggested that Plaintiff's self-reported symptoms and complaints were "manipulative behaviors." (*Id*.).

---

[6] While Dr. Farache made every effort to contact Plaintiff's treating physicians to discuss Plaintiff's functionality, these efforts were ultimately unsuccessful. (AR 972 – 73).

In an effort to further clarify Plaintiff's functionality, Aetna provided copies of Dr. Farache's report to Plaintiff's treating physicians for their review and response. (AR 821 - 850). Despite Aetna's efforts, Plaintiff's treating physicians failed to confirm their agreement or disagreement with Dr. Farache's findings, or provide any response at all to Aetna's inquiry. (AR 858). Nevertheless, Aetna continued its review, and evaluated the 2017 Transferable Skills and Labor Market Analysis' findings in light of Dr. Farache's opinion. (AR 489). In doing so, Aetna confirmed that the three alternative sedentary occupations identified in the 2017 Transferable Skills and Labor Market Analysis continued to serve as appropriate evidence of alternative "reasonable occupations" in light of Dr. Farache's opinion regarding Plaintiff's above-sedentary level functionality. (*Id*.). Thereafter, Aetna rendered its final determination, confirming that Plaintiff did not suffer impairments that would preclude her ability to perform full-time sedentary-level occupations (and, in fact, had above-sedentary-level functionality, despite her degenerative cervical and lumbar issues). (AR 854 - 57).

Aetna properly relied on the neurological peer review and opinion, which was firmly supported by the volume of normal examination findings in the Administrative Record. Indeed, the Eighth Circuit has held, time and again, that similar independent reviews constitute substantial evidence upon which an ERISA claims administrator can rely in adjudicating a claim for benefits. *See, e.g. Hare v. Hartford Life and Accident Insurance Co*., 2010 WL 4269238, at *3 (E.D. Ark. Oct. 27, 2010) (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (upholding "any occupation" denial, and holding that defendant was entitled to rely on two independent medical reviews in terminating plaintiff's claim for benefits). Given this line of authority, Aetna was fully justified in relying on Dr. Farache's independent neurological opinion in rendering its benefits determination. By the same token, Dr. Farache's opinion constitutes substantial evidence that

Plaintiff is not disabled from any "reasonable occupation." Thus, any attempts to discredit this opinion, or challenge Aetna's well-founded determination, should be rejected.

## II. Aetna's Decision to Discontinue Plaintiff's LTD Benefits Under the "Reasonable Occupation" Standard Was Reasonable, and Not Arbitrary and Capricious.

As set forth in Section I, *supra*, the Plan Administrator granted Aetna with discretionary authority to evaluate claims under the Policy, triggering an arbitrary and capricious standard of review for this case. Therefore, even assuming, for the purposes of argument that Aetna's decision is not legally correct (which Aetna categorically disputes), Aetna would still be entitled to summary judgment, so long as its determination was not arbitrary and capricious.

In the instant case, Aetna's decision to discontinue Plaintiff's LTD benefits (after paying two years during the "own occupation" period) is firmly supported by the substantial evidence in the Administrative Record, including: (1) objective physical and neurological examination findings confirming full range of motion in Plaintiff's neck and pain, as well as normal strength, tone, reflexes, and gait; (AR at 1282 – 83, 1294 – 95, 1309, 1321, ); (2) statements from Dr. Blagdon confirming that, as early as July 14, 2016, and as late as November 2017, Plaintiff was <u>not</u> restricted from sedentary level functionality (AR 534 and 1384); (3) Dr. Lewis' examination findings and above-sedentary restrictions (AR 1105); (4) statements from Plaintiff's neurosurgeon, Dr. Schlesinger, confirming that Plaintiff's condition  was not severe enough to require surgical intervention, and should be treated conservatively (AR 1193); a Transferable Skills and Labor Market Analysis identifying numerous alternative sedentary-level occupations within Plaintiff's functional capacity and required earnings potential (AR 1264 – 89); and an independent neurologist peer review report and addendum finding that the medical records did not support restrictions and limitations that would preclude Plaintiff from performing (at a minimum) sedentary-level occupations. (AR 962 – 75 and 888 – 93)

As the above evidentiary list demonstrates, the quality and quantity of evidence in the Administrative Record undeniably supports Plaintiff's ability to work in another occupation. Based on this volume of evidence, the terms of the Policy required Aetna to discontinue Plaintiff's benefits under the any "reasonable occupation" standard. Accordingly, Aetna's benefit determination, rendered only after it received overwhelming evidence that Plaintiff could perform other identified occupations, was imminently reasonable and legally correct. *See Turman v. Standard Insurance Co.*, 733 F. Supp. 2d 1048, 1053 (E.D. Ark. 2010) (holding that ERISA claims administrator did not abuse its discretion in determining plaintiff was not disabled from "any occupation" based on the record, which included two supporting independent peer reviews and a vocational report finding two alternative occupations meeting plaintiff's functional capacity); *Hare*, 2010 WL 4269238, at *3 (upholding ERISA claim administrator's "any occupation" determination under the arbitrary and capricious standard of review based on two independent peer reviews, the supportive opinion of plaintiff's own treating providers, and a vocational rehabilitation report finding alternative occupations meeting plaintiff's functional capacity); *Prezioso v. Prudential Insurance Co. of America*, 748 F.3d 797, 806 (8th Cir. 2014) (holding that benefit determination was not arbitrary and capricious, and that ERISA claims administrator provided a "full and fair" review where it obtained an independent medical review and vocational expert opinion prior to denying plaintiff's benefits claim). Consequently, summary judgment should be entered in Aetna's favor.

### III.    Aetna's Correctly Applied the Pre-existing Condition Limitation in the Policy to Bar Plaintiff's LTD Claim Based

As addressed above, Aetna's determination that Plaintiff was capable of performing any "reasonable occupation" despite her cervical and lumbar degenerative conditions was overwhelmingly reasonable, and certainly correct. Underscoring the non-disabling nature of these

degenerative spine conditions standing alone, Plaintiff argues that these conditions, when combined with her longstanding diagnoses of hemiplegic migraines, multiple strokes/transient ischemic attacks, depression, anxiety, and irritable bowel syndrome ("IBS"), render her completely disabled from working in any capacity. However, as explained below, Aetna correctly determined that these peripheral conditions were "pre-existing" conditions, as defined in the Policy. Consequently, these conditions are barred from coverage under the terms of the Policy, and cannot, in isolation or in combination, provide a basis for continued LTD benefits.

Here, it is undisputed that Plaintiff's coverage for LTD benefits under the Policy became effective on January 1, 2015. (AR 1556 – 57). It is further undisputed that Plaintiff ceased working and claimed disability as of April 5, 2015—just three months after her LTD coverage went into effect. (AR 620). Given this timeline, and as a preliminary matter, Plaintiff was required to demonstrate that she was "Disabled," and that said disability was not "caused, or contributed to, by a pre-existing condition" as defined in the Policy. (AR 86). To avoid the scope of the Policy's pre-existing condition limitation, Plaintiff must establish that she was not diagnosed with, or did not receive treatment or prescription medication for, any claimed disabling illness or injury during the three months before her LTD benefits became effective (from **October 1, 2014 – December 31, 2014**). (AR 86, 620, and 634). Considering the medical evidence and prescription history in the Administrative Record, Plaintiff simply has not (and cannot) meet this burden in connection with her contention that she is disabled, in part, due to hemiplegic migraines, stroke/transient ischemic attack, depression, anxiety, insomnia, and irritable bowel syndrome ("IBS").

In the present case, Plaintiff sought benefits after ceasing work due to diagnoses of hemiplegic migraines and stroke with symptoms of left-sided weakness and numbness. (AR 149 and 1515). In reviewing Plaintiff's claim, Aetna obtained medical records from Dr. Donald Brady, dated

October 12, 2015, which indicated that Plaintiff was first diagnosed with hemiplegic migraines and stroke in March 2014 after hospitalization and extensive testing. (AR 156). Dr. Brady confirmed that Plaintiff had been taking Topamax and Plavix as treatment for these conditions. (*Id*.). In addition to Dr. Brady's treatment notes, Aetna also obtained prescription records confirming that, in **October 2014**, Plaintiff obtained prescriptions for Topiramate and Clopidogrel. (AR 174, 635 and 1488).[7] Thereafter, a pre-existing condition evaluation was performed by Aetna's clinical consultant, Julie Ballas, on October 22, 2015. (AR 173 – 74). Ms. Ballas confirmed that Topiramate, detailed in Plaintiff's prescription history, was the brand name of an anticonvulsant drug used to prevent seizures, as well as reduce migraine frequency. (AR 174). She further confirmed that Plaintiff's prescription of Clopidogrel, also known as Plavix, was a drug used to prevent blood clots after heart attack or stroke. (*Id*.). Based on her combined review of Dr. Brady's medical records and Plaintiff's prescription history, Ms. Ballas determined that Plaintiff was diagnosed and treated for hemiplegic migraines during the pre-existing time period at issue. (AR 175).

Following Ms. Ballas' review, and based on the medical evidence in the Administrative Record, Aetna notified Plaintiff, on October 27, 2015, that she was not eligible for LTD benefits based on her hemiplegic migraine diagnosis, which was considered a pre-existing condition under the Policy. (AR 635). Plaintiff failed to formally appeal this initial pre-existing condition determination, and Aetna thereafter approved Plaintiff's claim under the "own occupation" standard due to Plaintiff's degenerative disc disease and related left-sided weakness which Aetna

---

[7] While past prescription records also revealed that Plaintiff received and filled prescriptions for Fluoxetine (used to treat depression) and Alprazolam (used for treatment of anxiety) during this same time frame, Plaintiff's initial claim did not seek benefits due to depression or anxiety, and therefore these medications were not specifically addressed in Aetna's initial pre-existing condition evaluation and review. (AR 634 – 36 and 1489 – 90). However, as described below, these conditions were addressed in connection with Plaintiff's appeal, and correctly found to be pre-existing conditions, barred from coverage.

determined were not "pre-existing" conditions under the Policy. (AR 651). After paying the full twenty-four months of benefits to Plaintiff as a result of her inability to perform her "own occupation" due to degenerative disc disease and its related symptoms, Aetna reviewed Plaintiff's claim under the any "reasonable occupation" standard, effective October 2, 2017, and determined that Plaintiff failed to demonstrate continued eligibility for benefits under this new standard. (AR 755 – 58). Appealing this determination, Plaintiff argued that she remained disabled due to degenerative disc disease and related symptoms, and the alleged "combined disabling effects" of a number of other conditions. (AR 1124 – 34).

In particular, Plaintiff's appeal resurrected her argument that hemiplegic migraines and stroke/transient ischemic attack contributed to her ongoing disability, despite Aetna's prior determination that these diagnoses were pre-existing and barred from coverage, based on the evidence that Plaintiff received treatment for this condition during the 30-day pre-existing condition look-back period. *See* (AR 1124 – 34). On appeal, Plaintiff further argued that the diagnoses of multiple strokes/transient ischemic attacks, depression, anxiety, insomnia, and IBS, in combination with her degenerative disc disease, supported her entitlement to continued benefits. (AR at 1125 – 29). Despite these arguments, Plaintiff's own representations on appeal and the medical evidence unequivocally establish that Plaintiff's alleged disabling conditions of hemiplegic migraines, stroke, depression, anxiety, and IBS are all pre-existing conditions, barred from coverage under the terms of the Policy. Stated differently, even assuming *arguendo* that these conditions somehow prevent Plaintiff from being able to engage in alternative sedentary occupations (which Aetna disputes), Plaintiff is *still* not eligible to recover LTD benefits based on these conditions. As a result, and as explained in further detail below, Aetna's determination that

these conditions were pre-existing, and, in turn, could not support continued eligibility for benefits, was legally correct.

To be certain, based on admissions in her appeal letter, and the medical evidence in the Administrative Record, Plaintiff cannot credibly dispute that these conditions are pre-existing or otherwise eligible for coverage. For example, in her appeal letter, Plaintiff represents that she is disabled, in part, due to multiple strokes and transient ischemic attacks, which she has suffered **since March 2014**. (AR 1126). Plaintiff proffers similar arguments regarding her diagnoses of depression, anxiety, and insomnia which, by her own admission, have been in place **from January 2011 to present**. (AR 1128). Lastly, Plaintiff argues that her IBS, an ongoing diagnoses that has been present **since January 2012**, contributes to her alleged ongoing disability. (*Id*.). In addition to Plaintiff's own admissions, the medical evidence in the Administrative Record conclusively establishes that each of Plaintiff's claimed disabling conditions, with the exception of her degenerative disc disease and related symptoms which were paid in full under the "own occupation" standard, are pre-existing conditions for which Plaintiff was diagnosed and/or received treatment during the relevant three month time frame. For example, the Administrative Record evidences the following, undisputed facts:

- Plaintiff was diagnosed with hemiplegic migraines and stroke in March 2014, and continued to receive treatment for these conditions with prescriptions of Plavix and Topamax from March 2014 through, at least, October 12, 2015 (both before, during, and after the 3-month lookback period) (AR 173, 177-78, 193 and 1560);

- Plaintiff was diagnosed with depression as early as June 23, 2011 (AR 995), and received a prescription of Fluoxetine (Prozac) for treatment of this condition on October 8, 2014 and November 20, 2014 (during the 3-month lookback period) (AR 172, 1489 and 1491);

- Plaintiff was diagnosed with anxiety as early as 2011, and received a prescription of Alprazolam (Xanax) for treatment on November 18, 2014 (during the 3-month lookback period) (AR 172);

- Plaintiff was diagnosed with insomnia as early as June 23, 2011 (AR 995) and, by Plaintiff's own admission, has maintained this diagnosis both during and after the 3-month lookback period (AR 1128); and

- Plaintiff was diagnosed with IBS as early as August 2, 2012 (AR 995) and, by Plaintiff's own admission, has maintained this diagnosis both during and after the 3-month lookback period (AR 1128 – 29).

As explained above, the Policy expressly bars coverage for a claimed disability contributed to by an illness for which Plaintiff was diagnosed or received treatment during the three month look back period **from October 1, 2014 – December 31, 2014**. (AR 86). While not inclusive, Plaintiff's admissions, and the above summary of evidence from the Administrative Record, confirm that Plaintiff either received treatment, or maintained diagnoses for the alleged disabling conditions of hemiplegic migraine, stroke, anxiety, depression, insomnia, and IBS during the time frame between **October 1, 2014 – December 31, 2014**.[8] Applying the Policy's pre-existing condition to the undisputed evidence in the Administrative Record, it becomes clear that these particular conditions fall squarely within the Policy's definition of pre-existing condition. Consequently, Aetna's determination that these conditions were excluded from coverage under the terms of the Policy was both correct and at the bare minimum reasonable and not arbitrary or capricious based on the substantial evidence in the Administrative Record.

## CONCLUSION

Based on the foregoing, Aetna conducted a full and fair review of Plaintiff's claim for LTD benefits under the any "reasonable occupation" definition of "Disability." Under the deferential standard of review accorded to Aetna's benefit determination, and considering the medical and

---

[8] In addition to clearly constituting "pre-existing conditions" barred from coverage under the Policy, Plaintiff's alleged disabling diagnoses of anxiety and depression, even if disabling, cannot provide a basis for awarding Plaintiff any "reasonable occupation" benefits since these benefits are limited to 24-months, and Plaintiff already received 24-months of LTD benefits.

vocational evidence in the Administrative Record, Aetna's decision to deny Plaintiff's LTD benefits was correct and at the bare minimum reasonable and neither arbitrary nor capricious, and fully supported by substantial evidence. Accordingly, Aetna respectfully requests that the Court grant judgment in its favor, and dismiss Plaintiff's claim for benefits with prejudice.

Respectfully submitted on this the 5th day of July 2019.


/s/ William B. Wahlheim, Jr.
William B. Wahlheim, Jr.
wwahlheim@maynardcooper.com

*Attorney for Defendant Aetna Life Insurance Company*

OF COUNSEL:
**MAYNARD, COOPER & GALE, P.C.**
1901 Sixth Avenue North
2400 Regions/Harbert Plaza
Birmingham, AL 35203-2618
(205) 254-1000 (phone)
(205) 254-1999 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on July 5, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

James F. Swindoll
Law Office of James F. Swindoll
212 Center Street, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 374-1290
Facsimile: (504) 374-3857

*Attorney for Plaintiff Johnnie Crites*

/s/ *William B. Wahlheim, Jr.*
OF COUNSEL